UNITED STATES DISTRICT COURT
DISTRICT OF WASHINGTON

| | |
|---|---|
| PERVENIA "PEAR" BROWN, on behalf of herself, DESCENDANTS OF THE 1816 EMIGRANTS FROM BOSTON TO SIERRA LEONE, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BRITISH PARLIAMENT, supreme legislative body of the United Kingdom, COMMONWEALTH OF MASSACHUSETTS f/k/a MASSACHUSETTS BAY COLONY, a sovereign state of the United States, CITY OF BOSTON, a city in Massachusetts, ESTATE OF WILLIAM PEIRCE, owner of the Massachusetts ship Desire, ESTATE OF JOHN WINTHROP, founder of Boston, ESTATE OF JOHN SAFFIN, a colonial New England merchant, and ESTATE OF HUGH HALL, a commission merchant in Boston,<br><br>Defendants. | IN ADMIRALTY<br><br>No. 22-cv-517-RSM<br><br>COMPLAINT<br><br>*Clerk's Action Required* |

COMES NOW PERVENIA "PEAR" BROWN ("Pear"), on behalf of herself, the DESCENDANTS OF THE 1816 EMIGRANTS FROM BOSTON TO SIERRA LEONE ("1816 Emigrants"), and others similarly situated ("Plaintiffs"), and allege as follows:

COMPLAINT - 1

## I. PARTIES, JURISDICTION AND VENUE

1.1  1816 Emigrants from Boston to Sierra Leone, at all time material hereto, were residents of Suffolk County, Massachusetts.

1.2  Defendants, British Parliament, Commonwealth of Massachusetts *f/k/a* Massachusetts Bay Colony, City of Boston, Estate of William Peirce, Estate of John Winthrop, Estate of John Saffin, and the Estate of Hugh Hall ("Defendants"), upon information and belief, at all time material hereto, were residents and/or had their principal place of business in Suffolk County, Massachusetts.

1.3  Venue is proper in Suffolk County, Massachusetts based on Defendants' residences, businesses and because egregious events material to the causes of action contained herein were "caused by a vessel on navigable waters" and "injury suffered on land was caused by a vessel on navigable waters", which occurred in Suffolk County, Massachusetts. As such, this satisfies conditions of both location and connection with maritime activity. 46 U.S.C. App. § 740.

1.4  "Venue is appropriate under 28 U.S.C. § 1391(b) and (c) because this is the district in which all parties were located, where Defendants conducted business, and where the events gave rise to this Complaint."

1.5  This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a)(1)(3) because tortious injury occurred during maritime transactions in "relat[ion] to ships in their use as ships, or to commerce as transport in navigable waters."[1]

## II. PERTINENT FACTUAL BACKGROUND

2.1  On or around February 26, 1638, Defendant Winthrop, founder of the city of Boston, located in the Commonwealth of Massachusetts, recorded in his journal the first

---

[1] *Sisson v. Ruby*, 497 U.S. 358, 363, 364, n.2.

COMPLAINT - 2

"documented reference…the sale of enslaved people in Massachusetts."[2]

2.2    References that Defendant Winthrop made in his journal pertained specifically to the Massachusetts ship *Desire* that returned from the West Indies carrying "some cotton, and tobacco, and negroes, etc. from thence…"[3]

2.3    Defendant William Peirce, owner of the Massachusetts ship *Desire*, "traffick[ed] enslaved people into the Massachusetts Bay Colony."[4]

2.4    Defendant Saffin's commercial activities included slave trading in Virginia, and he kept indentured servants in his own household.

2.5    Defendant John Saffin resided in Boston, where he became a prominent merchant and politician.

2.6    Beginning in 1672, the British Parliament granted the Royal African Company a monopoly.

2.7    From 1672 until 1698, the Royal African Company trafficked Plaintiffs' enslaved ancestors to Massachusetts Bay Colony, now known as the Commonwealth of Massachusetts.

2.8    From 1672 until 1696, millions of Plaintiffs' enslaved ancestors lost their lives as a result of the Royal African Company's monopoly, which was granted by the British Parliament, to traffic Plaintiffs' enslaved ancestors to the Massachusetts Bay Colony and other North American colonies.

2.9    "In 1696, the British Parliament revoked the monopoly held by the Royal African Company, enabling Massachusetts merchants and shipmasters to engage freely in the trade of

---

[2] Massachusetts Historical Society, *The Importation and Sale of Enslaved People*, <https://www.masshist.org/features/endofslavery/trade> Retrieved January 22, 2022.
[3] Dunn *et al.*, eds., *Journal*, 1996, p. 246.
[4] Massachusetts Historical Society. Winthrop Papers, Volume III (1643-1637). Boston: Merrymount Press, 1943. Page 290. Archive.org.

COMPLAINT - 3

enslaved people."[5]

2.10  The Massachusetts Historical Society ("MHS"), founded in 1791, noted that "Boston merchants began importing enslaved people directly from Africa" in or around 1644.

2.11  Plaintiffs' enslaved ancestors were denied compensation in exchange for their labor, denied meal and rest breaks as they labored on plantations, and forced to work from dawn to dusk, no less than six days a week for as many as twelve hours a day, millions of whom were forced to do so their entire lifetime.

2.12  These claims are timely, as injury is ever-present and recurs because Defendants enjoyed, and their heirs continue to enjoy the economic advantages, benefits, and profits from Plaintiffs ancestors' uncompensated labor.

2.13  Plaintiff's enslaved ancestors "were an essential part of the master's wealth."[6]

2.14  Plaintiffs' enslaved ancestors' uncompensated labor fueled the economy of the American Colony now known as the Commonwealth of Massachusetts, by which it amassed great wealth.

2.15  Defendants benefitted and profited monetarily as a result of their unwillingness to compensate Plaintiffs' enslaved ancestors for their labor, knowledge, and rice-growing expertise.

2.16  According to an article by the MHS entitled, *African Americans and the End of Slavery in Massachusetts* "Massachusetts and Rhode Island were the principal slave trading colonies in New England, and Boston was one of the primary ports of departure for ships carrying enslaved people."

2.17  Of particular note, "[t]he ownership of enslaved people was significant

---

[5] Massachusetts Historical Society, *The Importation and Sale of Enslaved People*, <https://www.masshist.org/features/endofslavery/trade> Retrieved January 22, 2022.
[6] Arkley, Alfred. (1965), *Slavery in Sierra Leone*. Unpublished Masters' Thesis, Columbia University, p. 98.

COMPLAINT - 4

economically in Rhode Island where there were sizable plantations using enslaved labor."[7]

2.18   Barbados native, Defendant Hugh Hall, was a wealthy commission merchant in Boston, "who carried on a significant trade with his island homeland, part of which involved importing people from Barbados to Boston."[8]

2.19   From 1705 until 1706, a miscegenation act imposed a £4 import duty on Plaintiffs' enslaved ancestors brought into the colony.

2.20   The miscegenation act permitted Defendants to "recoup his expenses if an enslaved person were sold out of the colony within a year, or if they died within six weeks of import."

2.21   During the trade of Plaintiffs' enslaved ancestors, "Colonial governors in the eighteenth century were specifically forbidden to assent to any law laying duties on or discouraging the trade of enslaved people."[9]

2.22   Defendants used the miscegenation act of 1705-1706 to raise revenue for the American colony now known as the Commonwealth of Massachusetts while Defendants trafficked Plaintiffs' enslaved ancestors during the transatlantic slave trade.

2.23   Defendant Hall maintained an account book from 1728 until 1733, which he made import entries as it pertained to those that purchased Plaintiffs' enslaved ancestors.

2.24   Defendant Hall's account book "for the years 1728-1733 contains pages (pp. 5, 6, 8, 9, 27, 28, 29, 30, 31, 34, 35, and 36) with entries concerning enslaved people and their purchasers."[10]

2.25   From 1740 until 1769, craftsmen in Boston "used enslaved people in their trades,

---

[7] Massachusetts Historical Society, *The Importation and Sale of Enslaved People*, <https://www.masshist.org/features/endofslavery/trade> Retrieved January 22, 2022.
[8] Ibid.
[9] Ibid.
[10] Ibid.

COMPLAINT - 5

but the shipping and sale of enslaved people out of Boston was much more significant."[11]

2.26   Defendant "Hall often noted when people he enslaved died, or were sold out of the province, probably so that he could recover the costs of import duties."[12]

### III.   VIOLATION OF HUMAN RIGHTS AND CIVIL RIGHTS

3.1   Plaintiffs allege and incorporate herein by this reference the preceding paragraphs as though set forth in full.

3.2   "In 1644, Boston merchants began illegally trafficking [and] enslav[ing] people directly from Africa, selling them in the West Indies, and bringing home sugar to make rum, initiating the so-called triangular trade."[13]

3.3   From 1644 until the 1800s, Defendants engaged in and trafficked Plaintiffs' enslaved ancestors from the continent of Africa to Massachusetts Bay Colony and other North American colonies.

### IV.   CAUSES OF ACTION

4.1   Defendants' unfair, willful misconduct, and deceptive acts and practices occurred during the course of Defendants trade or commerce.

4.2   Defendants' unfair, willful misconduct, and deceptive acts and practices affected and continues to affect the public interest.

4.3   As a direct and proximate cause of Defendants cruel, unfair, and deceptive acts and practices, Plaintiffs' enslaved ancestors suffered damages in an amount to be proven at trial.

4.4   Plaintiffs' enslaved ancestors were forcibly taken from their native homelands, the continent of Africa, by Defendants and shackled to the interior and decks of slave ships, then

---

[11] Ibid.
[12] Ibid.
[13] Ibid.

trafficked to Massachusetts Bay Colony and other American colonies, where they were auctioned off like property and forced to work on plantations for which Plaintiffs' enslaved ancestors were denied compensation in exchange for their labor.

4.5     Plaintiffs' enslaved ancestors suffered loss of enjoyment of life.

4.6     Plaintiffs' enslaved ancestors were denied lifetimes of compensation in exchange for their labor.

4.7     Plaintiffs' enslaved ancestors were denied meal and rest breaks and forced to toil on plantations no less than six days a week, for no less than twelve hours each day.

4.8     Plaintiffs' enslaved ancestors were "unlawfully kidnapped"[14] and trafficked to foreign lands, which deprived them of innate civil rights, human rights, and enjoyment of life and liberty.

4.9     Plaintiffs' enslaved ancestors were denied access to physical care, education, voting rights, and the right to purchase property.

## V.     UNJUST ENRICHMENT

5.1     Defendants failed to compensate Plaintiffs' enslaved ancestors for their labor, knowledge and rice-growing expertise.

5.2     Plaintiffs' injury is ever-present, as Defendants enjoyed and their heirs continue to enjoy the economic advantages, benefits, and profits of Plaintiffs' enslaved ancestors' uncompensated labor.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.     Judgment against Defendants for damages in an amount to be proven at trial;

---

[14] *United States v. Libellants and Claimants of the Schooner Amistad*, (1841).

COMPLAINT - 7

2. Judgment against Defendants for treble damages, attorneys' fees, and costs of suit.

3. Prejudgment and post-judgment interest in an amount allowed by law; and

4. Attorney fees, costs, and expenses of suit as allowable.

5. Other such relief as the Court may deem just and proper.

DATED this 16th day of April, 2022.

By: /s/ Pervenia Pear Brown
Pervenia "Pear" Brown
*Pro se* for Plaintiffs

COMPLAINT - 8